IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

CATHLEEN M. GRAUSE VINCENT,    )
                               )    NO. 4:12-cv-00157-RAW
          Plaintiff,           )
                               )    RULING ON DEFENDANTS'
     vs.                       )    MOTION FOR SUMMARY
                               )    JUDGMENT
STORY COUNTY, IOWA, STORY      )
COUNTY ATTORNEY'S OFFICE, and  )
STEPHEN HOLMES, in his         )
Individual and Official        )
Capacity,                      )
                               )
          Defendants.          )

This matter is before the Court following hearing on defendants' resisted motion for summary judgment [13]. Plaintiff Cathleen M. Grause Vincent was employed by Story County, Iowa as the Victim Witness Coordinator in the County Attorney's office. Her employment was terminated effective May 23, 2011. She filed a Petition in the Iowa District Court on March 6, 2012 in three counts. Count One is a claim under 42 U.S.C. § 1983 that the termination of Ms. Vincent's employment violated her First Amendment rights to free speech and freedom of association. Counts Two and Three claim respectively that the County failed to pay her overtime compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and Iowa Wage Payment Collection Law, Iowa Code ch. 91A. Defendants removed the case to this Court on April 16, 2012. The defendants deny the constitutional and statutory violations alleged and defendant Stephen Holmes, the Story County Attorney, asserts the defense of qualified immunity to

the § 1983 damages claim against him. Mr. Holmes is a defendant only on the federal constitutional claim. Story County is the only defendant on the federal and state wage claims. Though named as a defendant, there is no claim pleaded against the Story County Attorney's Office.

By the present motion, defendants challenge all of plaintiff's claims. The case is before me pursuant to 28 U.S.C. § 636(c). The Court has federal question jurisdiction of the First Amendment and FLSA claims and supplemental jurisdiction of the state law wage claim. 28 U.S.C. §§ 1331, 1367(a).

## I. SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment only if, after viewing the evidence in the light most favorable to the nonmoving party and affording the nonmovant all reasonable inferences, *see Coker v. Arkansas State Police*, 734 F.3d 838, 841 (8th Cir. 2013); *Burton v. St. Louis Bd. of Police Com'rs*, 731 F.3d 784, 791 (8th Cir. 2013), the depositions, answers to interrogatories, admissions, affidavits, or other materials presented to the court, show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Foster v. Missouri Dept. of Health and Sr.* Services, 736 F.3d 759, 762 (8th Cir. 2013); *Preston v. City of Pleasant Hill*, 642 F.3d 646, 651 (8th Cir. 2011); Fed. R. Civ. P. 56(a), (c)(1)(A). "A dispute is genuine if the evidence is such that it could cause a reasonable

jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Flores v. U.S.*, 689 F.3d 894, 902 (8th Cir. 2012); *Rakes v. Life Investors Ins. Co. of Am.*, 582 F.3d 886, 893 (8th Cir. 2009)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party must first inform the court of the basis for the motion and identify the portions of the summary judgment record which the movant contends demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)(citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)); *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 742-43 (8th Cir. 2009); *Robinson v. White County, Ark.*, 459 F.3d 900, 902 (8th Cir. 2006)). The nonmoving party must then "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir. 1999); *see Torgerson*, 643 F.3d at 1042; *Glorvigen*, 581 F.3d at 743; *In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008); *Thomas v. Corwin*, 483 F.3d 516, 526-27 (8th Cir. 2007); *Littrell v. City of Kansas City, Mo.*, 459 F.3d 918, 921 (8th Cir. 2006).

## II.   FACTS

Many of the facts are undisputed. To the extent they are, the Court has viewed the evidence in the light most favorable to plaintiff Vincent and given her the benefit of all reasonable inferences which flow from the evidence.

Ms. Vincent began working for the Story County Attorney's office as a full-time employee in June 1997. (Pl. App. [31-2] at 2). The County has a Victim Witness Assistance Program which provides services to victims and witnesses in connection with criminal proceedings, and coordinates their appearance for court proceedings and depositions. (*See* Def. Supp. App. [35-3] at 99). Initially Ms. Vincent's job duties involved assisting the office's investigator and providing victim witness services. (Pl. App. [31-2] at 2). At some point she became a victim witness program assistant. (*Id.* at 3).

In 1999 Ms. Vincent became the Victim Witness Coordinator. (Pl. App. [31-2] at 3). The parties dispute the extent of Ms. Vincent's management responsibilities in that position. Ms. Vincent worked with two victim witness assistants, Sara Thomsen and Cindy Koepsel, as well as two paid interns and sometimes unpaid interns. Ms. Vincent testified she supervised the "workflow" between herself and the two assistants by which she meant balancing the work between the three of them and seeing that the work got done. (*Id.* at 4-5). Ms. Vincent did not have the authority to hire

4

or fire the victim witness assistants, though was involved in the hiring process to the extent of being present for hiring interviews and gave her opinions to Mr. Holmes who made the final hiring decisions. (Pl. App. [31-2, 3] at 4, 43; Def. Supp. App. [35-3] at 86). There is evidence she also had some involvement in disciplining the victim witness assistants. Specifically she authored a memorandum in 2008 critical of Ms. Koepsel's failure to set up some depositions in a case. Ms. Koepsel submitted a grievance to Mr. Holmes about the memorandum. (Pl. App. [31-2] at 8; Def. App. [14] at 49). She also wrote a memorandum to then-office manager Kathy Tiffany in 2008 about Ms. Thomsen's failure to follow up on a restitution request, (Def. App. [14] at 100), a memorandum Ms. Vincent testified she was directed by Mr. Holmes and Ms. Tiffany to write after Ms. Vincent brought the delinquency to their attention. (Pl. App. [31-2] at 9).

Ms. Vincent completed employment evaluations for Ms. Thomsen and Ms. Koepsel in 2006. (Pl. App. [31-2] at 10; Def. App. [14] at 103-06).

Ms. Vincent was also involved in interviewing and selecting interns, oversaw their training, and supervised their work. (Def. Supp. App. [35-3] at 84, 86). Final hiring decisions for paid interns were made by the office manager. (Pl. App. [31-2] at 6). Ms. Vincent had a bigger role in the discipline and discharge of the interns than she did with respect to the victim witness assistants. (Def. Supp. App. [35-3] at 87).

Most of Ms. Vincent's time, however, was spent doing the same victim/witness work as the assistants, Ms. Thomsen and Ms. Koepsel. Teresa Smith was the "legal executive officer" for the Story County Attorney's Office at the time of the events in issue with supervisory authority over Ms. Vincent. (Pl. App. [31-2, 3-4] at 23, 64, 102-03). Ms. Smith estimated Ms. Vincent spent twenty-five percent of her time each week performing supervisory work rather than performing direct victim/witness work. (Pl. App. [31-3] at 73-74).

On April 10, 2011 while she was out of town, Ms. Vincent learned from her husband that his first cousin Kevin Johnson had been shot and killed. (Def. App. [14] at 44-45). Mr. Johnson had been shot by a Nevada, Iowa[1] police officer. (*Id.* at 44). Ms. Vincent knew the Story County Attorney's office would not be involved in any investigation of Mr. Johnson's death due to her family relationship to him. (Pl. App. [31-2] at 13). As she returned to Nevada, Ms. Vincent contacted Iowa Department of Criminal Investigation agent Adam DeCamp and left a message with Nevada Police Sergeant Martinez in an effort to obtain information about when relatives would be able to see the body. (Def. App. [14] at 49-51).[2] She also contacted Tim Meals, an assistant Story County

---

[1] Nevada is the county seat of Story County.

[2] There is an issue about the propriety of these calls, which Ms. Vincent made using telephone numbers known to her from her
(continued...)

Attorney, to let him know of her family relationship with Kevin Johnson. (Pl. App. [31-2] at 14-15). Ms. Vincent did not know at the time of these calls that Johnson had been shot by a Nevada police officer, a fact she learned only upon her return on April 10. (*Id.* at 17).

On April 11, 2011 County Attorney Holmes and executive officer Smith met with Ms. Vincent to tell her the Story County Attorney's office would not investigate Kevin Johnson's death, the investigation would be handled by the Iowa Attorney General's office, and that Ms. Vincent should not discuss the details of the investigation with anyone, including other office staff and her family and friends. (Pl. App. [31-2, 3-4] at 20-21, 75-76, 48-49, 104-05, 110, 117-18). Mr. Holmes did not want anyone in his office commenting about the incident with anyone in the community and Ms. Vincent understood from her meeting with him that she was not to do so. (Pl. App. [31-4] at 118-19; Def. App. [14] at 59; Def. Supp. App. [35-3] at 143). In unemployment hearing testimony Mr. Holmes explained that it was important for his office to have nothing to do with the investigation so that no matter what the outcome they would not be "tainted" by it. (Pl. App. [31-4] at 118). He saw his office as "opinion leaders" in the community. Everyone in his

---

[2](...continued)
employment, but as the matter did not play a part in her termination, it is not material.

office was his agent and in his experience what his employees said would carry a higher level of credibility. (*Id.* at 119).

The Story County Attorney's office maintains close relationships with the Nevada Police Department and the Iowa Attorney General's office. (Def. App. [14] at 95-96). A good relationship with both was important because of the need to work closely with local law enforcement (the Nevada Police Department was one of five law enforcement agencies in the county) on criminal cases and to rely on the Attorney General's office to prosecute cases in which the County Attorney was conflicted. (Def. App. [14] at 95-96). Ms. Vincent worked closely with both the Nevada Police Department and the Iowa Attorney General's office. (*Id.* at 66).

At some point, Ms. Vincent asked the office receptionist to give all new calls from victims in Nevada police cases to Ms. Thomsen or Ms. Koepsel. She had received a call about a situation involving the Nevada police and the caller made a comment about the shooting incident. After this experience Ms. Vincent thought it best that she not take new calls involving the department.[3] (Pl. App. [31-2] at 23).

On May 9, 2011 Ms. Vincent met again with Mr. Holmes and Ms. Smith. Mr. Holmes had been told by the Attorney General's

_____

[3] There is some dispute in the record about whether Ms. Vincent also removed herself from existing Nevada Police Department cases on which she had been working, and whether she told the receptionist the call redirection was temporary, but these facts are not material to the issues in the summary judgment motion.

Case 4:12-cv-00157-RAW   Document 46   Filed 01/14/14   Page 9 of 47

office that the results of the shooting investigation were about to be released. He gave Ms. Vincent this information and instructed her she was not to comment about the results of the investigation. (Pl. App. [31-2, 3-4] at 26, 54-55, 77-78, 107, 120-21).

Ms. Vincent was at the Nevada Police Department on May 5 or 10, 2011[4] and saw the police officer who had shot her husband's cousin. Later that day Ms. Vincent talked to Ms. Thomsen by phone, telling her she did not know if she was returning to the office, explaining, according to Ms. Thomsen, that she "saw my cousin's killer" at the department, had thought he was on leave, and had not been prepared to see him. (Pl. App. [31-2] at 22; Def. App. [14] at 109). Ms. Vincent admits she could have referred to the officer as Ms. Thomsen says, but she could not remember and has testified she might instead have said she saw "the officer that killed my cousin." (Pl. App. [31-2] at 22). Ms. Thomsen reported the conversation to Ms. Smith the next day. (*Id.* [31-4] at 93-95).

An individual named Nick Herridge had been a good friend of Kevin Johnson and was a friend of Ms. Vincent's. (Pl. App. [31-2] at 27). On May 12, 2011, after the results of the investigation

---

[4] In an affidavit two months after Ms. Vincent was discharged Ms. Thomsen gave the date of this conversation as May 5, 2011. (Def. App. [14] at 109). In her deposition she did not recall the date. (Pl. App. [31-4] at 93). Ms. Vincent testified she believed the conversation occurred on May 10, 2011. (*Id.* [31-2] at 22).

had become public knowledge,[5] he posted a comment on his Facebook page[6] stating: "My friend was not the piece of sh** you say he was! He was a good person you shot for no reason and now you must cover it up!" (*Id.* at 28, [31-4] at 140). Ms. Vincent saw the post in her Facebook feed and clicked "like."[7] (*Id.*) Ms. Vincent had her Facebook settings programmed so only her Facebook "friends" could see her posts on her Facebook page. ([31-2] at 30). She did not know how Mr. Herridge had set his page up. (*Id.*) Ms. Vincent's Facebook page identified her as an employee of Story County. (Def. App. [14] at 68).

Apparently one of the assistant county attorneys found Herridge's comment and Ms. Vincent's "like," showed both to Ms. Thomsen, who in turn informed Ms. Smith, who brought the matter to Mr. Holmes' attention. (Pl. App. [31-3] at 61; Def. Supp. App. [35-3] at 132).

---

[5] The Court understands the investigation found that the shooting was justified. (*See* Pl. App. [31-2, 3] at 28, 55).

[6] Facebook is an internet social networking site. Facebook users can post information on their "page," can control the privacy of the information they post and can limit access to certain information. The program permits an individual who has access to a user's information to "like" that information or comment on it. Users can also "unlike" their posts (an un-do option). (Pl. App. [31-2] at 27-28).

[7] If the Court reads the Facebook page correctly Ms. Vincent clicked "like" the same day as Mr. Herridge's post, May 12, 2011. (Pl. App. [31-4] at 140).

In her deposition Ms. Vincent agreed with a number of things about the Herridge post and the potential consequences of "liking" it. She acknowledged the cover-up referred to by Mr. Herridge's post would be by either the Nevada Police Department or the Iowa Attorney General's office and that it was reasonable to view her "like" as indicating she agreed with Herridge. (Def. App. [14] at 65, 67). But she also testified she had not intended to convey that she agreed with Herridge that there had been a cover-up. (*Id.* at 67-68). She only intended to agree with the first part of Mr. Herridge's statement that Mr. Johnson was not a "piece of sh**." She started to type something to the effect that she agreed with that part of Mr. Herridge's post but disagreed there had been a cover-up, but "I decided I didn't know what to say, and I deleted it and clicked 'like' instead." (*Id.* at 68-69).

Ms. Vincent also agreed in her deposition that her "like" of the Herridge post could have had a "profound negative impact on the operation of the county attorney's office," (Def. Supp. App. [35-3] at 68), an adverse impact on the office's relationship with the Nevada Police Department and Attorney General's office, (Pl. App. [31-2] at 32; Def. App. [14] at 71), and could have made it difficult for her to work closely with both entities. (Def. App. [14] at 66-67).

Mr. Holmes testified that the way Ms. Vincent's "like" post was discovered would have meant that everyone in the office

would have known about it because office staff all talk. (Def. Supp. App. [35-3] at 132). Mr. Holmes never spoke with anyone at the police department or Attorney General's office about Ms. Vincent's post and Ms. Smith testified she was not aware of any evidence that the County Attorney's relationship with either entity was harmed by the post. (Pl. App. [31-3] at 57, 81).

According to Mr. Holmes, an assistant county attorney, Tiffany Meredith, told him on May 18, 2011 that in a conversation Ms. Vincent referred to the police officer who shot Mr. Johnson as a "f****** bastard." (Def. App. [14] at 88-90). Ms. Vincent denies making the statement. (Pl. App. [31-2] at 22; Def. Supp. App. [35-3] at 24-25). In a contemporaneous e-mail to Mr. Holmes reporting her conversation with Ms. Vincent, Ms. Meredith wrote she could not recall exactly what Ms. Vincent had said about the police officer, but Ms. Vincent had made unprofessional comments and said something about the Nevada Police Department being "horrible." (Pl. App. [31-4] at 139).

On May 18, 2011 Ms. Vincent was called to a meeting with Mr. Holmes and Ms. Smith. (Pl. App. [31-2] at 30). When she arrived at the meeting, Mr. Holmes had a copy of Mr. Herridge's Facebook post on his desk. He told Ms. Vincent the "like" of the post was exactly the type of comment he had asked her not to make. (*Id.* [31-2, 3-4] at 31, 58, 79-80, 108-09, 123-24). Mr. Holmes was very upset and said so. He told Ms. Vincent she had violated his

instructions not to discuss the shooting by the "like" post, as well as the "cousin's killer" comment to Thomsen, and "f******ster" bastard" reference to Meredith. (Def. Resp. to Pl. Stmt. of Facts [35-2] ¶ 97 (multiple record citations)). While Ms. Vincent did not agree with much of what Mr. Holmes told her, in her deposition she did agree her "like" post violated Mr. Holmes' instruction not to discuss the shooting. (Pl. App. [31-2] at 31). Ms. Vincent felt intimidated by Mr. Holmes and did not attempt to explain her "like" post. (*Id.* at 33).

Ms. Vincent's impression from this meeting was that she was being told she could not talk to anyone, even family, about the Kevin Johnson shooting in any respect. (Def. Supp. App. [35-3] at 42-43). Ms. Vincent knew better than to talk with anyone, even her husband, about criminal matters and investigative matters she learned of in the course of her employment, but she did not have any investigative information about the Johnson shooting from her employment because the County Attorney's Office was not involved. (*Id.*; Pl. App. [31-2, 3] at 12, 20, 46-47).

On May 19, 2011 Ms. Smith sent Ms. Vincent a letter informing her she was suspended for insubordination and direct disobedience. A meeting was scheduled for Monday, May 23, 2011 at 1:00 p.m. (Pl. App. [31-2] at 34, 141). At that meeting, Mr. Holmes told Ms. Vincent she had jeopardized his job as his was a political office. (*Id.* at 34, 60; Def. Supp. App. [35-3] at 131). Mr. Holmes

gave Ms. Vincent the option of resigning employment or being fired. She did not resign. On May 26, 2011 Ms. Smith sent Ms. Vincent a letter informing her  that her employment was terminated effective May 23, 2011 "due to your insubordination and direct disobedience to Mr. Holmes' direction. . . ." (Pl. App. [31-2, 3] at 36, 142).

At a subsequent unemployment hearing Mr. Holmes testified to the effect that Ms. Vincent was terminated because "she was having conversations with persons in the community about the facts of the shooting," referring to her "like" post to Mr. Herridge's comment. (Def. Supp. App. [35-3] at 147-49). It is evident from this that Mr. Holmes saw the Facebook post as a violation of his instruction not to comment on the shooting and that this was the principal reason for Ms. Vincent's termination, making it the appropriate focus of the discussion which follows. It appears Mr. Holmes was also influenced by a sense of personal betrayal. He saw Ms. Vincent's conduct as jeopardizing his re-election and career. (Pl. App. [31-2, 4] at 34, 125-26).

### III. DISCUSSION

### A.   Overtime Wage Claims

Defendant Story County first challenges Ms. Vincent's claim in Count Two of the Complaint for overtime pay under the FLSA and her parallel state law claim in Count Three under the Iowa Wage Collection Law. Specifically, it argues the undisputed facts demonstrate Ms. Vincent is an exempt executive employee under both acts and is not entitled to overtime. Plaintiff argues there are

14

factual issues regarding all of the elements of the exemption but one.

    1.   <u>Law</u>

      The FLSA requires generally that employees working more than 40 hours a week receive overtime compensation at a rate not less than one and one-half times their regular hourly wages. 29 U.S.C. § 207(a)(1). Employees "employed in a bona fide <u>executive</u>, administrative, or professional capacity. . ." are exempt from this requirement. *Id.* § 213(a)(1). Iowa law adopts the exemptions from the minimum wage requirements in § 213. Iowa Code § 91D.1(2)(a). Consequently, the federal and state wage claims travel together on the applicability of the executive capacity exemption.

      The exemption is an affirmative defense. *Fife v. Harmon*, 171 F.3d 1173, 1174 (8th Cir. 1999). Story County thus has the burden of proving Ms. Vincent was an exempt executive. *Guerrero v. J.W. Hutton, Inc.*, 458 F.3d 830, 834 (8th Cir. 2006). FLSA exemptions are "narrowly construed against the employer asserting them, and ought to be applied only in those circumstances which plainly and unmistakably come within their terms and spirit." *Donovan v. Bereuter's, Inc.*, 704 F.2d 1034, 1036 (8th Cir. 1983); *see Spinden v. GS Roofing Products Co., Inc.*, 94 F.3d 421, 426 (8th Cir. 1996), *cert. denied*, 520 U.S. 1120 (1997)(citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)); *Jones v. Dolgencorp, Inc.*, 789 F. Supp. 2d 1090, 1102 (N.D. Iowa 2011). "Disputes

regarding the nature of an employee's duties are questions of fact, but the ultimate question whether an employee is exempt under the FLSA is an issue of law." *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1081 (8th Cir. 2000)(citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

2. <u>Analysis</u>

The FLSA gives the Secretary of Labor "broad authority to 'defin[e] and delimi[t]' the scope of the exemption for executive, administrative, and professional employees." *Auer v. Robbins*, 519 U.S. 452, 456 (1997)(quoting 29 U.S.C. § 213(a)(1)). Both sides direct the Court's attention to the regulations in Subparts B and H of 29 C.F.R. Part 541 as they relate to claimed executive employees.[8] Under the regulations an "employee employed in a bona fide executive capacity" means any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . .;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

---

[8] The regulations cited in this ruling were in effect at the time Ms. Vincent was terminated.

29 C.F.R. § 541.100(a). The first element is undisputed. Though Ms. Vincent minimizes the extent to which she directed the work of the assistants and interns, she admits she assigned work to other victim witness employees to manage workflow and assure the work got done. The third element is also satisfied.

The analytical focus is on the second and fourth elements. As to the first of these, the parties dispute whether Ms. Vincent's primary duty was management of the Victim Witness Assistance Program. The second element incorporates three components: "primary duty," "management," of "the enterprise . . . or of a recognized department or subdivision." At the outset it is fair to regard the Victim Witness Assistance Program as a recognized subdivision of the County Attorney's office. *See* 29 C.F.R. §§ 541.100(a), 103(a).

Ms. Vincent's "primary duty" must have been management of the program. The regulations define "primary duty."

> [A]n employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other

> employees for the kind of nonexempt work
> performed by the employee.

29 C.F.R. § 541.700(a).

On the amount of time performing exempt work factor the regulations instruct:

> The amount of time spent performing exempt
> work can be a useful guide . . . but is not
> the sole test, and nothing . . . requires that
> exempt employees spend more than 50 percent of
> their time performing exempt work. . . .
> Employees who do not spend more than 50
> percent of their time performing exempt duties
> may nonetheless meet the primary duty
> requirement if the other factors support such
> a conclusion.

29 C.F.R. § 541.700(b).

The regulations give numerous nonexclusive examples of what constitutes "management." Among the many functions listed in the regulations that might apply here are "interviewing, selecting and training of employees," "directing the work of employees," "planning the work," and "apportioning the work among employees." 29 C.F.R. § 541.102.

The County's primary duty argument focuses on the facts that Ms. Vincent assigned work to the assistants and the interns (Def. App. [14] at 5-7); was involved in interviewing, selecting and training the assistants and interns (*id.* at 7-10, 14-21); made "tens of thousands of dollars more per year" than the program assistants (*id.* at 38-39); was involved in discipline and performance evaluation of the interns and victim witness assistants

18

(*id.* at 18-31, 99, 100-101, 103-104, 105-106); and her supervisory duties, which fell upon Ms. Smith when Ms. Vincent was terminated, took about 25% of Ms. Vincent's time. (*Id.* at 84). According to County Attorney Holmes, Ms. Vincent ran the day-to-day operations of the victim witness program and exercised a great deal of discretion in doing so, including setting her own work schedule. (Pl. App. [31-3] at 43, 46).

Ms. Vincent responds her primary duty was providing direct services to victims and witnesses[9] as evidenced by the fact only 25% of her time was spent supervising the other assistants. (Pl. App. [31-2] at 3, 85, 69-70, 73-74). She distinguishes her work from that of the other assistants only with respect to management of workflow and oversight of intern training. (Pl. Brief [30-1] at 31). She did not monitor the work hours of the victim witness assistants, set their compensation or handle personnel matters. (Pl. App. [31-2] at 5, 11, 44, 143). She argues that while she may have given the assistants some memos or performed some evaluations of their work, it was at the direction of Mr. Holmes and the office manager. (*Id.* at 8-10; Def. App. [14] at 100-102,

---

[9] "Direct services" includes "talking to victims or witnesses who came to the office, making and taking phone calls, writing letters, and other communication; working with law enforcement and other witnesses; and assisting the prosecutors with the successful prosecution of criminal cases, including draft court documents, making travel arrangements, scheduling meetings and depositions, arranging for a court reporter, and transporting witnesses." (Pl. Brief [30-1] at 30; *see* Pl. App. [31-2] at 3-4).

105-06). With respect to oversight of interns, she testified she interviewed and selected only unpaid intern positions (Pl. App. [31-2] at 6); the office manager selected paid interns. (*Id.* at 6, 45). Ms. Vincent would make recommendations to the office manager regarding termination of internships. (*Id.* at 7). Ms. Vincent directs the Court's attention to a case in the District of Oregon where summary judgment was denied based on the court's determination that a similarly situated plaintiff's claim (the Oregon plaintiff was director of a victim assistance program) that more than 50 percent of her time was spent on direct services to victims created a material factual issue on whether the Oregon plaintiff's primary duties were management. *Moore v. Deschutes County*, 2003 WL 23590755, at *4 (D. Ore. Oct. 2, 2003).

The County replies that even if most of Ms. Vincent's work may have been non-exempt that does not preclude a finding her primary duty was management. Under the regulations that fact is not determinative. 29 C.F.R. § 700(b). That the other factors support a management primary duty finding is, argues the County, also supported by the deposition testimony of the victim witness assistants. Both testified that Ms. Vincent assigned cases; recruited, assigned and supervised the interns; supervised and reviewed their work; and consulted with outside agencies. (Def. Supp. App. [35-3] at 107-111, 112-113, 115-117). In particular, Ms. Koepsel testified that in addition to directing the program,

20

assigning cases, giving initial approval for time off, training and supervising the interns, and working with outside agencies, Ms. Vincent reviewed the assistants' work when cases were completed and would evaluate their performance. Ms. Vincent had her own cases on which she worked but Ms. Koepsel was not aware if anyone reviewed Ms. Vincent's work. (Def. Supp. App. [35-3] at 107-09, 110-11, 112-13).

Ms. Vincent's written job description, which while relevant is not conclusive, recited that the FLSA status of her job was "[e]xempt" and described her "[p]rimary essential function" as a combination of what appear to be both exempt and non-exempt duties.

> Under general supervision to administer and coordinate the County Attorney's Victim Witness Assistance program as outlined in Chapter 915 of the Iowa Code. Provides direct service to victims and witnesses. Sends out correspondence to victims and witnesses regarding status of criminal cases. Performs investigative duties pursuant to attorneys directive. Performs procedural duties and prepares reports and statistics related to those duties; supervises office support staff of two (2) victim witness assistants and a minimum of two (2) Interns each semester; sets up conferences and meetings; makes travel arrangements for victims, witnesses and police officers; subpoenas witnesses for trials, depositions and other hearings. Serves as a member of several organizations related to victim issues on county attorney's behalf.

(Def. Supp. App. [35-3] at 99). Following the primary essential function description is a list of twenty-six "[e]ssential duties"

21

which, while difficult to pigeonhole all, from the description of the everyday victim witness assistance work in the record, supports Ms. Smith's estimate and Ms. Vincent's testimony that most of Ms. Vincent's time was spent doing the same witness victim assistance work as the assistants. (*Id.* at 99-101).

When the summary judgment record is viewed favorably to Ms. Vincent, the relevant primary duty factors laid out in the regulations cut both ways. The jury could find that the preponderance of Ms. Vincent's work, in fact well over 50 percent, was spent in the non-exempt functions of assisting and coordinating victim and witness activities.

The relative importance of Ms. Vincent's exempt and non-exempt duties is difficult to gauge on the summary judgment record, but the work Ms. Vincent and the assistants performed in common in assisting victims and witnesses, keeping them informed about the progression of criminal proceedings, facilitating their appearance when required, and processing restitution claims was undoubtedly very important work for the County, and with respect to victim services was to some extent statutorily mandated. *See* Iowa Code § 915.13. Ms. Vincent's exempt work coordinating activities of the victim witness program and making sure the work got done was no doubt equally important. The relative importance factor does not weigh heavily on either side.

Ms. Vincent was relatively free from direct supervision. She was also paid more than the assistants, but on close look the jury could find the wage difference was not compelling in view of Ms. Vincent's greater tenure and the work they all performed. When promoted to Victim Witness Coordinator in 1999 Ms. Vincent's salary was increased about $500 to nearly $1,400 bi-weekly. (Def. App. [14] at 33). When she was terminated Ms. Vincent was being paid a salary of about $2,200 bi-weekly. (*Id.* at 34). At the time Ms. Koepsel was being paid $1,750 bi-weekly and Ms. Thomsen about $1,550. Arguably there was not a great deal of difference between Ms. Vincent's salary and the wages paid to the assistants for the kind of non-exempt work they all performed.

Taking all of the primary duty evidence together and viewing it favorably to Ms. Vincent, the Court finds there is a genuine issue of fact concerning whether Ms. Vincent's primary duty was management.

The fourth element, Ms. Vincent's authority to hire and fire, and the weight given her suggestions and recommendations on those and related subjects, is also fairly disputed. Other than the unpaid interns, Ms. Vincent had no authority to hire or fire employees. Mr. Holmes testified in his deposition to the effect that he gave particular weight to Ms. Vincent's hiring and firing opinions. (Def. Supp. App. [35-3] at 120-22). Other than being present at the hiring interviews of Ms. Koepsel and Ms. Thomsen,

all Ms. Vincent could recall is that she had recommended a different candidate for hire than Ms. Koepsel. (Pl. App. [31-2] at 4-5). As far as the evidence indicates Ms. Vincent evaluated the assistants once, in 2006, some five years before her termination, from which it may be inferred evaluating the performance of the assistants was not a regular part of her duties. The evidence of arguable involvement in disciplining employees is also limited. She wrote the 2008 memorandum critical of Ms. Koepsel's failure to set up some depositions and, according to Ms. Vincent, at the direction of Mr. Holmes and Ms. Tiffany authored the 2008 memorandum critical of Ms. Thomsen's failure to follow up on a restitution request. The frequency with which an alleged executive employee makes suggestions or recommendations about the status of other employees, and the frequency with which what the employee has to say is relied upon are factors in determining the "particular weight" component of the fourth element. *See* 29 C.F.R. § 541.105. The jury could conclude Ms. Vincent's involvement in hiring, firing or affecting the status of other employees was infrequent as was any reliance on her input. The fourth element of the executive capacity inquiry is also in genuine dispute.

Mindful that the County has the burden of proof on the applicability of the executive capacity exemption, the rule of construction against the employer on the applicability of FLSA exemptions, and the favorable view of the evidence to which Ms.

Vincent is entitled on consideration of a motion for summary judgment, the Court finds there are genuine issues of material fact about the nature of Ms. Vincent's duties which preclude entry of summary judgment on the FLSA and Iowa wage payment claims.

**B.   The First Amendment Claim**

Ms. Vincent's First Amendment claim has two parts. She alleges her discharge violated her free speech right to comment on the Johnson shooting, and also her right to expressive association. The Court will discuss each in turn.

1.   <u>Free Speech</u>

a.   Law

"A public employer 'may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'" *McGee v. Pub. Water Supply, Dist. #2*, 471 F.3d 918, 919 (8th Cir. 2006)(quoting *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)). A public employer as an employer may, however, restrict an employee's speech which "has some potential to affect the [public] entity's operations." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Whether a public employer may restrict employee speech in given circumstances involves a two-part inquiry which crystallized with the Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and since been honed into well-established law by subsequent Supreme Court cases.

> The first [inquiry] requires determining
> whether the employee spoke as a citizen on a

25

> matter of public concern. *See* [*Pickering*, 391
> U.S.] at 568. If the answer is no, the
> employee has no First Amendment cause of
> action based on his or her employer's reaction
> to the speech. . . . If the answer is yes,
> then the possibility of a First Amendment
> claim arises. The question becomes whether the
> relevant government entity had an adequate
> justification for treating the employee
> differently from any other member of the
> general public. *See Pickering*, 391 U.S. at
> 568.

*Garcetti*, 547 U.S. at 418 (one citation omitted). *See Buehrle v. City of O'Fallon, Mo.*, 695 F.3d 807, 812 (8th Cir. 2012); *McGee*, 471 F.3d at 919-20 & n.2. Public employee speech made pursuant to official duties of the public employee, and speech on "matters only of personal interest" are generally not protected by the First Amendment. *Garcetti*, 547 U.S. at 421 (official duty speech); *Connick v. Myers*, 461 U.S. 138, 147 (1983)(personal interest speech).

Speech involves a matter of public concern when it addresses a "matter of political, social, or other concern to the community" at large. *Connick*, 461 U.S. at 146. *See Dahl v. Rice Cty., Minn.*, 621 F.3d 740, 744 (8th Cir. 2010). "[C]ontent, form and context of a given statement, as reflected by the whole record" must be considered in determining the issue. *Connick*, 461 U.S. at 147-48; *see Dahl*, 621 F.3d at 744. The case law provides additional general guidelines. Certain subjects have been recognized as by their nature involving matters of public concern, among them speech associated with the use of public funds, and speech exposing

26

criminal activity or other potential misconduct by public officials. *See Sexton v. Martin*, 210 F.3d 905, 910 (8th Cir. 2000); *Kincade v. City of Blue Springs, Mo.*, 64 F.3d 389, 396 (8th Cir. 1995), *cert. denied*, 517 U.S. 1166 (1996); *Barnard v. Jackson Cty., Mo.*, 43 F.3d 1218, 1225 (8th Cir.), *cert. denied*, 516 U.S. 808 (1995). The employee's motivation in speaking is a consideration in determining the employee's role. *Bausworth v. Hazelwood Sch. Dist.*, 986 F.2d 1197, 1198 (8th Cir. 1993).

If the speech addresses a matter of public concern, the second inquiry requires the court to balance the "interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the [public employer], as an employer in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. *See Belk v. City of Eldon*, 228 F.3d 872, 878 (8th Cir. 2000), *cert. denied*, 532 U.S. 1008 (2001). The *Pickering* balancing of these competing interests is "highly fact-specific" and involves consideration of a number of interrelated factors. *Belk*, 228 F.3d at 880. These include:

> (1) the need for harmony in the office or workplace; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the speech arose; (5) the degree of public interest in the speech; and (6) whether the

> speech impeded the employee's ability to
> perform his or her duties.

*Id.* at 880-81; *Sexton*, 210 F.3d at 911. "The *Pickering* balance is flexible, and the weight to be given any one factor depends upon the specific circumstances of each case." *Shands v. City of Kennett*, 993 F.2d 1337, 1344 (8th Cir. 1993), *cert. denied*, 510 U.S. 1972 (1994); *see Gordon v. City of Kansas City, Mo.*, 241 F.3d 997, 1003 (8th Cir. 2001).

"The more the employee's speech reflects matters of public concern, the greater the employer's showing must be that the speech was disruptive before the speech can be punished." *Sexton*, 210 F.3d at 912. On the other hand, the employee's position and responsibilities within the government entity may tilt the balance in favor of the employer. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin*, 483 U.S. at 390. If an employee serves a "confidential, policymaking, or public contact role" the employee's speech is more likely to affect the effective functioning of the public employer than that of a rank-and-file employee. *Id.* at 390-91.

The rule in this circuit is that absent extraordinary circumstances, the *Pickering* balance is to be undertaken only if the public employer has produced specific evidence that the employee's speech had an actual adverse affect on the public employer's operations. "To trigger the *Pickering* balancing test, a

28

public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships." *Lindsey v. City of Orrick, Mo.,* 491 F.3d 892, 900 (8th Cir. 2007). *See, e.g.,* *Gordon*, 241 F.3d at 1003 ("if the government employer cannot produce some evidence showing that the employee's speech *disrupted* the workplace, the court need not proceed to the balancing stage absent special circumstances")(emphasis original); *Belk*, 228 F.3d at 881 (quoting *Burnham v. Ianni*, 119 F.3d 668, 678, 680 (8th Cir. 1997)); *Kincade*, 64 F.3d at 396; *Mattingly v. Milligan*, 2011 WL 5184283, at *4 (E.D. Ark. Nov. 1, 2011); *Glandon v. Keokuk Cty. Health Ctr.*, 408 F. Supp. 2d 759, 767 (S.D. 2005). Mere allegations and unsupported assertions are not enough. *Shockency v. Ramsey Cty.*, 493 F.3d 941, 949-50 (8th Cir. 2007), *cert. denied*, 552 U.S. 1143 (2008); *Kincade*, 64 F.3d at 398 (quoting *Grantham v. Trickey*, 21 F.3d 289, 294 (8th Cir. 1994)), *Mattingly*, 2011 WL 5184283, at *4.

Yet the cases also hold an actual adverse impact is not an inflexible prerequisite to *Pickering* balancing.

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern.

29

*Connick*, 461 U.S. at 151-52. Particularly is this the case in our circuit when the employer is a public safety employer whose operations require close working relationships. *See Tyler v. City of Mountain Home, Ark.*, 72 F.3d 568, 570 (8th Cir. 1995)(police officer speech); *Tindle v. Caudell*, 56 F.3d 966, 972 (8th Cir. 1995)(same); *Shands*, 993 F.2d at 1344, 1346 (firefighter speech). In such cases the importance of the public safety function is seen to allow greater latitude in regulating employee speech. *See Tyler*, 72 F.3d at 570 (citing *Tindle*).

Whether a public employee's speech addresses a matter of public concern and the outcome of the *Pickering* balance of interests are questions of law for the Court, though any disputed factual issues should be submitted to the jury to decide. *See Buehrle*, 695 F.3d at 812; *Belk*, 228 F.3d at 878, 881.

If the two-step inquiry works out in favor of a finding that the public employee's speech was protected, the employee must establish a causal connection to the adverse employment action and, in this case, avoid the defense of qualified immunity. In the case of the termination of employment, the former is shown by evidence that the speech "was a 'motivating factor' in the . . . decision." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Qualified immunity is discussed separately below.

30

b.    Analysis

The material facts are not in dispute with respect to Ms. Vincent's "like" post to Mr. Herridge's Facebook comment about the Johnson shooting. The comment, made after the results of the Attorney General's investigation were revealed, communicated Mr. Herridge's belief that Johnson was a better person than as described by the police and/or investigators, that the shooting was not justified, and that the real reason for the shooting had been covered up by the police and/or the Attorney General. By posting her "like" to the comment, Ms. Vincent appeared to agree with Herridge. Ms. Vincent has admitted the post violated County Attorney Holmes' instruction not to comment on the incident. The post could have had a negative impact on the close working relationships the County Attorney's office had with both the Nevada Police Department and the Iowa Attorney General's office, relationships important to the work of the office, and could also have impeded Ms. Vincent's performance of her duties as Victim Witness Coordinator which required her to work closely with both entities. If Ms. Vincent's "like" could have been disruptive to these relationships, there is no evidence that it in fact was so, or that the Iowa Attorney General or Nevada police were even aware of her "like." Nor is there any specific evidence the "like" post disrupted the harmony and efficient operations within the County Attorney's Office. Finally, there is no dispute about the fact the

"like" post was a motivating factor in Mr. Holmes' decision to terminate Ms. Vincent. Indeed, it was the primary reason for the termination decision and, as noted, is the focus of the free speech analysis.

Internet technology continues to develop at an ever accelerating rate. What is new today is likely to be old if not tomorrow, within a year or so, perhaps months. The law struggles to keep up. When Mr. Holmes fired Ms. Vincent the issue of whether and in what circumstances one person's "like" of another person's Facebook comment without more could be First Amendment speech was a blank slate. While there had been a few cases in which courts had recognized a substantive Facebook comment could be protected First Amendment speech, that a mere "like" of someone else's comment could be so was a step beyond. *See Bland v. Roberts*, 857 F. Supp. 2d 599, 603-04 (E.D. Va. 2012), *rev'd*, 730 F.3d 368 (4th Cir. 2013). In *Bland* the district court held "that merely 'liking' a Facebook page is insufficient speech to merit constitutional protection" because "[i]t is not the kind of substantive statement that has previously warranted constitutional protection." *Id.* at 603-04.

The Fourth Circuit recently reversed the district court on this issue. *Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013). After a lengthy discussion of what it means to "'like' a Facebook

page"[10] the Fourth Circuit held clicking the "like" button was both "pure speech" and a form of symbolic expression for First Amendment purposes. *Id.* at 385-86. "Liking" a Facebook comment generates a "pure speech" textual statement, and is symbolic expression because the person liking the statement conveys a message of agreement with the statement likely to be so understood by persons who see it. *Id.* (citing *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)); *see* Ira P. Robbins, *What is the Meaning of "Like"? The First Amendment Implications of Social-Media Expression*, 7 FED. COURTS L. REV. 127, 144-45 (2013). This Court agrees that a "like" post to a Facebook comment can be speech on a matter of public concern if the comment liked is itself speech on a matter of public concern. The simple fact is that the use of internet social media like Facebook is an ever increasing way people speak to each other in the twenty-first century. Social media speech tends to be in an abbreviated vernacular, but it is still speech.

While Ms. Vincent's "like" was speech, whether she spoke as a citizen on a matter of public concern is a closer question. The use of deadly force by a police officer is an obvious subject

---

[10] One of the plaintiffs in *Bland* was a sheriff's deputy who claimed he was not reappointed because he had visited the Facebook campaign page of the sheriff's election opponent and posted that he "liked" the page. 730 F.3d at 380-81, 385-86. Ms. Vincent's case is different in that she "liked" a comment, not a page. The Court does not believe the "like" of a Facebook page and the "like" of a Facebook comment is a material distinction in determining whether the latter is speech.

of public concern in the community in which it occurs, perhaps even more so in a small community. The very reason Mr. Holmes did not want Ms. Vincent to comment on the shooting was because the level of public concern was such he felt it was particularly important that members of his staff have nothing to say about it in view of the fact his office would have no involvement in the investigation. Mr. Herridge's posted statement conveyed his belief the shooting was not justified and the investigation a cover-up. "[S]peech concerning potential misconduct by public officers is a matter of public concern." *Sexton*, 210 F.3d at 910.

The content of speech is not, however, alone sufficient; the employee's role and motivation for speaking must also be considered. *See Dahl*, 621 F.3d at 644 (quoting *Cox v. Dardanelle Publ. Sch. Dist.*, 790 F.2d 668, 672 (8th Cir. 1986)); *Bausworth*, 986 F.2d at 1198. Ms. Vincent's motivation was personal. The shooting victim was a family member and she was upset. She also evidently did not intend the message her "like" post would reasonably be taken to mean -- that she agreed the investigation was a cover-up. These motivation and intent factors to an extent run counter to a finding that Ms. Vincent spoke as a concerned citizen, but the Court concludes do not compel such a finding. Though Ms. Vincent's motivation in speaking was personal, the subject of her speech was not and clearly involved a matter of public concern. If she did not intend to say what she appeared to

34

say, for analytical purposes the Court believes her speech should be taken for what the recipient would reasonably take it to mean, and for what her employer evidently took it to mean. Ms. Vincent's "like" post was speech on a matter of public concern. Her motivation and intent are more appropriately considered in the *Pickering* balance.

In contrast Ms. Vincent's "killer" and "f****** bastard" descriptions of the police officer who shot Mr. Johnson, if made, were not speech as a citizen on a matter of public concern. In content and form they are simply disparaging characterizations which betray no more than personal animosity. The "killer" comment was allegedly made as part of an explanation why Ms. Vincent might be absent from the office. The context of the "bastard" remark is not clear except that it occurred in an in-house conversation with an assistant county attorney. In neither case was Ms. Vincent acting as a concerned citizen. *See Schilcher v. Univ. of Arkansas*, 387 F.3d 959, 963 (8th Cir. 2004).

Whether the Court should undertake the *Pickering* balance in the absence of evidence that Ms. Vincent's speech in fact disrupted the harmony of the workplace or the County Attorney's working relationships with the Iowa Attorney General or Nevada police is both a close question and a largely determinative one on the merits of the free speech claim. If, as Ms. Vincent argues, the *Pickering* balance is not applicable in the absence of evidence of

an actual disruptive effect, Ms. Vincent prevails on her free speech claim with respect to the "like" Facebook post (subject, however, to consideration of Mr. Holmes' qualified immunity defense). If the *Pickering* balance is undertaken, for the reasons which follow the interest of defendants in the County Attorney's efficient performance of his duties weighs more heavily than the interest of Ms. Vincent in expressing her "like" of what Mr. Herridge said about the shooting and subsequent investigation.

The Court concludes the importance of Mr. Holmes' public responsibilities as a county attorney require the *Pickering* balance be undertaken in the circumstances here. The primary duty of a county attorney is to "[d]iligently enforce" the law. Iowa Code § 331.756(1). Ms. Vincent was a long-term employee who served as Victim Witness Coordinator. Hers was a public contact position. Ms. Vincent's work brought her in frequent contact with the Nevada police and Iowa Attorney General's office with whom the County Attorney's office had close relationships important to its operations. A Nevada police officer shot and killed one of Ms. Vincent's family members. The shooting was investigated by the Iowa Attorney General. Believing it important that his office completely divorce itself from the investigation Mr. Holmes did not want anyone in his office commenting about the incident because what they said might be imputed to his office and be given unwarranted weight. He told Ms. Vincent not to discuss the shooting. She

36

violated his instruction by making the "like" post. Her speech held the potential to disrupt the County Attorney's working relationship with the Nevada Police and Attorney General's office, as well as impede Ms. Vincent's performance of her job. The internet is ubiquitous and word gets around. Seen in context at the time, these concerns were reasonable as Ms. Vincent has acknowledged. Similar to a public safety employer, the importance of the county attorney's law enforcement responsibilities ought to permit a higher degree of deference in regulating the speech of key employees which it is reasonable to believe may adversely affect working relationships important to the fulfillment of those responsibilities.

Ms. Vincent's interest in agreeing with Mr. Herridge's comment carries minimal weight. It is apparent Mr. Herridge's comment was an emotional reaction to the investigation which evidently had just cleared the police officer. So was Ms. Vincent's "like." She was as noted motivated by personal interest from her family connection to Mr. Johnson. *See O'Connor v. Steeves*, 994 F.2d 905, 915 (1st Cir.), *cert. denied*, 510 U.S. 1024 (1993)("[I]nsofar as self-interest is found to have motivated public employee speech, the employee's expression is entitled to less weight in the *Pickering* balance than speech on a matter of public concern intended to serve the public interest."). Her speech was not intended to serve the public interest by revealing official misconduct, indeed she did not intend her "like" to convey the

implied charge of misconduct reasonably to be taken from it. That the "like" was in violation of Mr. Holmes' instruction not to comment on the incident further detracts from Ms. Vincent's interest in making it.

On the other side of the scale, there is the importance of the County Attorney's relationships with local law enforcement and the Iowa Attorney General and the potential effect Ms. Vincent's "like" may have had on those relationships, as well as her own ability to perform her important duties. In her position and with her tenure Ms. Vincent's work for the County Attorney would have been well-known to the Nevada police, and the Iowa Attorney General's office, as well as members of the public she had assisted. Her speech seemingly critical of the police and the investigation of the incident was more likely than, for example, that of a clerical employee to be attention getting. Someone in her position would be expected to exercise more caution than that reflected in her apparent joinder in Mr. Herridge's reaction to the results of the investigation.

Two facts diminish the weight to be given the defendants' interests. First, Ms. Vincent's "like" post was made on May 12, 2011 but she was not terminated until eleven days later. The likelihood of any adverse consequences from the post attenuated with the passage of time. After eleven days a reasonable person might think the moment had passed. Second, Mr. Holmes' concern with

re-election and career to the extent a motivating factor in his termination decision are to be given no weight in the balance. His personal interests are no more important than Ms. Vincent's. The Court concludes nonetheless that the interests of defendants prevail in the *Pickering* balance owing to the potential adverse effect of Ms. Vincent's "like" post on the efficient discharge of the law enforcement responsibilities of the County Attorney's office.   Ms. Vincent's discharge did not violate her First Amendment free speech rights and summary judgment will be granted on the free speech claim.

   2.   <u>Freedom of Association</u>

   Ms. Vincent's freedom of association claim is factually based on the concerns expressed by Mr. Holmes in his unemployment hearing testimony and in the May 23, 2011 termination meeting with Ms. Vincent about the potential effect of her comments on his chances for re-election and career. Specifically, at the unemployment hearing Mr. Holmes testified:

> I don't think Miss Vincent understands the damage that she's caused me in this. I don't think that I'll ever recover for this. I have to run for election. She is part of a large family group in Nevada. To some degree they are opinion leaders. I have to be able to stand for all the communities that I have to ask to be elected.

(Pl. App. [31-4] at 125-26). According to Ms. Vincent, at the termination meeting Mr. Holmes said something to the effect that she had "shot his career." (*Id*. [31-2] at 34).

Ms. Vincent characterizes her free association claim as not one for interference with "intimate association," but rather as one for violation of her "expressive association" rights "based on her political association with members of the Story County voting public, which included members of her 'large family group.'" (Pl. Supp. Brief [42] at 2). *See Roberts v. United States Jaycees*, 468 U.S. 609 (1984)(discussing the two distinct types of freedom of association claims). Her theory relies on accepting the doubtful premise that her membership in a large and influential family was a protected political association.

The Eighth Circuit's first, and to this point only, case to address a political discrimination claim is *Wagner v. Jones*, 664 F.3d 259 (8th Cir. 2011). In that case the plaintiff alleged she was not hired as an instructor or part-time adjunct instructor at the University of Iowa College of Law because of her advocacy of socially conservative causes, including opposition to abortion. *Id.* at 264. The court began its discussion with the observation that "the First Amendment prohibits a state from basing hiring decisions on political beliefs or associations with limited exceptions for policy making and confidential positions." *Id.* at 269 (citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79 (1990)). Looking to First Circuit case law, the *Wagner* court said that a plaintiff in a political discrimination claim has the "threshold burden to produce sufficient direct or circumstantial evidence from which a

rational jury could find that political affiliation was a substantial or motivating factor behind the adverse employment action." *Id.* at 270 (quoting *Rodriguez-Rios v. Cordero*, 138 F.3d 22, 24 (1st Cir. 1998)). Ms. Vincent's claim fails at the threshold because her large family is just that, a family not a political association. Nor does Ms. Vincent ascribe any particular political belief to herself or her family. She does not indicate what her political affiliation, if any, was.

Ms. Vincent cites two cases from the Third Circuit in support of her argument Mr. Holmes' perceptions about her family and its influence could support an expressive association claim based on political association, *Goodman v. Pennsylvania Turnpike Comm'n*, 293 F.3d 655 (3d Cir. 2002) and *D'Orazio v. Washington Township*, 2010 WL 3982387 (D.N.J. 2010). Neither case supports plaintiff. *Goodman* was a "political patronage case[]" in which the plaintiff alleged he was not promoted "because he and his family members were registered, active Democrats," and the person who was promoted was a registered Republican. 293 F.3d at 661, 663. The Third Circuit held the employer's knowledge of Goodman's political affiliation could be inferred from circumstantial evidence that his uncle was "extremely active" in the Democratic party and his entire family participated in Democratic politics. *Id.* at 672. Citing *Goodman*, the district court in *D'Orazio* similarly concluded family connections could be considered as proof of political association

41

and knowledge by the employer. 2010 WL 3982287, at *5. The plaintiff alleged he had been passed over for promotion to a full-time law enforcement position "because of his political association with Democrats influential within" the defendant township. *Id.* at *4. The court held there was sufficient evidence that plaintiff had a protected political association as a Democrat because he was a registered Democrat and was a member of a well-known family that had been involved in politics for many years. *Id.* In both cases the political activities of family members were seen as evidence of plaintiff's association with a political party. In neither case was the plaintiff's family considered a political association in itself.

Beyond this, *Goodman* and *D'Orazio* hold the elements of a political association (patronage) discrimination claim include proof "that the employee maintained an affiliation with a political party . . . [and] that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision." *Goodman*, 293 F.3d at 663-64; *D'Orazio*, 2010 WL 3982287, at *4. Again, no evidence has been presented that Ms. Vincent was affiliated with a political party or that her political affiliation (or association) had anything to do with the termination decision.

That a motivating factor in Mr. Holmes' termination decision was concern that Ms. Vincent's speech imperiled his re-election and future political career in part because Ms. Vincent

42

was a member of a large influential family is not enough to demonstrate that Ms. Vincent was terminated because of her political beliefs or association.

## C.   Qualified Immunity

Mr. Holmes argues he has qualified immunity from suit on Ms. Vincent's free speech and freedom of association claims. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stoner v. Watlingten*, 735 F.3d 799, 802 (8th Cir. 2013)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

There are two steps in the qualified immunity inquiry. The court determines first whether the conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 242 (2009)(holding the *Saucier* two-step sequence of analysis is not required)). "If so, we next consider whether the right was clearly established at the time of the misconduct." *Stoner*, 735 F.3d at 803. "In determining whether the legal right at issue is clearly established, this circuit applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles." *Id.* (quoting *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th

43

Cir. 1989)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Chambers v. Pennycook*, 641 F.3d 898, 908 (8th Cir. 2011)(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The second step is a "fact-intensive inquiry" which "must be undertaken in light of the specific context of the case, not as a broad proposition." *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004)(quoting in part *Saucier*, 533 U.S. at 201); *see Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir. 2005). "[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Littrell*, 388 F.3d at 582 (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The doctrine of qualified immunity "'protects all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. Al-Kidd*, ___ U.S. ___, ____, 131 S. Ct. 2074, 2085 (2011)(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Court has found that Mr. Holmes' conduct in discharging Ms. Vincent for her "like" post, and the alleged in-house comments about the police officer involved in the shooting, did not violate her First Amendment rights to free speech or freedom of association when the facts are viewed in the light most favorable to Ms. Vincent. If the analysis, however, were to pass beyond the first to the second "clearly established" step, a finding of qualified immunity is still appropriate.

The general principles of First Amendment law pertaining to restriction on public employee speech have been well-established for many years. The contours of the First Amendment rights involved were not, however, so clear when considered in context that a reasonable official in Mr. Holmes' position would have known the discharge of Ms. Vincent violated her First Amendment rights.

With respect to the principal basis for the free speech claim, the "like" Facebook post, there was no "factual correspondence with precedent" at the time Mr. Holmes acted which would have alerted one in his position to the proposition a "like" of another person's Facebook comment could, without more, be protected speech. About a year after Ms. Vincent's discharge the district court in *Bland*, *supra*, in what appears to be the first case of its kind, held that a simple "like" post to a Facebook page did not merit First Amendment protection. *Bland*, 857 F. Supp. 2d at 603-04. The Fourth Circuit reversed, but only after first assessing what it means to "like" a Facebook page in order to understand the issue. *Bland*, 730 F.3d at 385-86.

If the "like" post was speech, that it was on a matter of public concern would not necessarily have been apparent for the reasons discussed previously. Ms. Vincent may be seen to have acted primarily out of a personal, emotional reaction to the results of the investigation, not as a concerned citizen.

The Court does not believe a reasonable public official would be bound to consider Ms. Vincent's unadorned "killer" and "f****** bastard" descriptions of the police officer involved as protected speech on a matter of public concern.

Whether the *Pickering* balance should be applied in the absence of evidence that Ms. Vincent's speech in fact disrupted the working environment or the important relationships with the Nevada police and Iowa Attorney General is itself a close question, also for the reasons previously stated. However, if the fact-intensive *Pickering* balance of interests is to be applied the outcome would at the very least have been unclear to a reasonable official in Mr. Holmes' position. "[W]hen *Pickering*'s fact-intensive balancing test is at issue, the asserted First Amendment right can rarely be considered clearly established for 'qualified immunity' purposes . . . ." *Sexton*, 210 F.3d at 914 (quoting *Grantham*, 21 F.3d at 293).

Mr. Holmes' entitlement to qualified immunity at the second step of the inquiry on Ms. Vincent's free association claim is particularly evident. The relevant case law is limited. Ms. Vincent's theory under it is novel and without precedential support.

IV.

CONCLUSIONS AND ORDER

Defendants have established there is no genuine issue of material fact and they are entitled to summary judgment on Ms. Vincent's First Amendment claims as a matter of law. The defendant County has failed to establish that it is entitled to summary judgment on Ms. Vincent's federal and state wage claims. Summary judgment is therefore **denied** on Counts 2 and 3 of the Complaint, and **granted** on Count 1. The case will come on for jury trial on the wage claims against only the defendant County. As a result of this ruling defendants Holmes and the County Attorney's Office are dismissed from the case.

Status conference with counsel is set with the Court for **Tuesday, January 28, 2014 at 9:00 a.m.** to re-set the case for trial and appropriate pretrial proceedings. The Court will conduct the status conference by means of the Meet-Me conference line. Counsel should call (515) 284-6267 at the scheduled time and enter passcode 116267 to be joined with the call.

IT IS SO ORDERED.

Dated this 14th day of January, 2014.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE

47